IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(Kansas City, Kansas, Docket)

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | } |
| | } |
| Plaintiff, | } |
| | } |
| v. | } Case No. 16-20097-JAR/DJW |
| | } |
| **KEITH L. COUNTESS,** | } |
| **PLASTER MASTERS, L.C.,** | } |
| **MARCOS LANE STUBBS,** | } |
| **LUIS FELIPE GUERRERO-GUERRERO,** | } |
| **JOSE FELIPE HERNANDEZ-CALVILLO,** | } |
| **MAURO PAPALOTZI, and** | } |
| **ISAAC GALLEGOS,** | } |
| | } |
| Defendants. | } |

## INDICTMENT

The Grand Jury charges:

## SUMMARY OF CHARGES

**Count 1**, Conspiracy to Encourage or Induce Undocumented Aliens to Reside in the U.S. for Commercial Advantage or Private Financial Gain, 8 U.S.C. § 1324(a)(1)(A)(iv) and (v)(I).

**Counts 2-9**, Encouraging or Inducing Undocumented Aliens to Reside in the U.S. for Commercial Advantage or Private Financial Gain, 8 U.S.C. § 1324(a)(1)(A)(iv) and (v)(II).

## GENERAL ALLEGATIONS

1.   On or about the dates specified herein, defendant Keith L. Countess

1

(Countess) was the principal owner of defendant Plaster Masters, L.C. (Plaster Masters), a Kansas limited liability company based at 619 N. 2nd St., Lawrence, Kansas.

2. Plaster Masters is a drywall subcontractor for commercial and residential construction projects in and around the Kansas City metropolitan area. "Drywall" is shorthand for interior walls usually constructed from sheets of pressed gypsum, paper joint tape and plaster.

3.   Defendant Marcos Lane Stubbs (Stubbs) has been active in drywall installation in the Kansas City area and devised a scheme to enable drywall subcontractors to use undocumented workers to install drywall.

4.   Defendant Luis Felipe Guerrero-Guerrero (Guerrero) managed crews of workers who installed drywall for Plaster Masters and other drywall subcontractors.

5.   Defendant Jose Felipe Hernandez-Calvillo (Hernandez) managed crews of workers who installed drywall for Plaster Masters and other drywall subcontractors.

6.   Defendant Mauro Papalotzi (Papalotzi) managed crews of workers who installed drywall for Plaster Masters and other drywall subcontractors.

7.   During the times specified herein, defendant Isaac Gallegos (Gallegos)

operated the Boost Mobile cellular telephone store at 1319 Santa Fe, Olathe Kansas.

8.    In about August 2011, a person named Jose Torres-Garcia (Torres) learned about a way to make money by being a financial intermediary between drywall subcontractors and drywall construction crews made up primarily of undocumented alien workers. The persons who described the venture to Torres were defendants Gallegos and Stubbs.

9.    Gallegos and Stubbs explained to Torres that in order to pay undocumented drywall workers, someone had to serve as financial conduit between the subcontractors and the workers. They described a model in which the subcontractor would contract directly with drywall crews but would use Torres as the financial intermediary.

10.    The model described by Gallegos and Stubbs centered on Torres's holding himself out as a drywall subcontractor when his actual role was merely to receive checks from drywall construction crews, deposit the checks into accounts he established, then withdraw cash from those accounts to pay crew leaders, who in turn paid cash to themselves and the crew workers.

11.    The model required that Torres obtain workers compensation insurance and liability insurance certificates for his shell drywall company, which he called "Jose R. Torres Drywall." The drywall crews would present Torre's

insurance certificates to the drywall subcontractors hiring the crews to satisfy the subcontractor's legal and contractual insurance requirements even though the subcontractors often knew Jose R. Torres Drywall didn't do drywall work and acted only as a means by which the undocumented workers would get paid for their work.

12.   To get the venture started, in the fall of 2011 Torres borrowed about $1,400 from Gallegos, who allowed Torres to operate from Gallego's Boost Mobile store in Olathe, and Torres established bank accounts at the Bank of America branch at 175 N. Clairborne, Olathe, Kansas, and the Wells Fargo Bank branch at 2137 E. Santa Fe, Olathe, among others.

13.   The drywall crews were paid weekly. They directed the subcontractor to make their checks payable to "Jose R. Torres Drywall" and would pick the checks up directly from the subcontractors, usually on Fridays. Those checks were taken to Torres, usually at the Boost Mobile store, who then would deposit the checks into the accounts he established. On those occasions when Torres was not at the store when the checks were delivered, Gallegos or one of his employees would receive the checks, and then turn them over to Torres.

14.   The next day, usually on Saturday mornings, Torres then would withdraw cash from those accounts sufficient to pay the drywall crews, usually at

the Bank of America branch in Olathe. For this service, Torres charged the five percent, which he withheld from his cash payments to the crews.

15. Torres usually made the cash payments by dividing the cash he withdrew from the bank into envelopes for each drywall crew. Torres would write on the outside of the envelopes the total amount of the check deposited, the name of the crew leader, the amount of the five percent withheld by Torres, and the net amount, meaning the amount of cash contained in the envelope.

16. The payments also usually were made at Gallego's Boost Mobile store, where someone from the drywall crew would come to pick up the envelope. Sometimes the payments were made at Torres's nearby residence or at other predetermined locations.

17. Of the five percent withheld by Torres, during about the first year of the venture Torres paid Gallegos two of the five percent and one percent to Stubbs, who often referred drywall crews to Torres. After the first year, he no longer paid Gallegos the two percent but continued to pay one percent to Stubbs keeping the remaining four percent for himself.

18. Between about October 2012 and about October 2014, checks made payable to Jose R. Torres Drywall totaling about $11.5 million were deposited into two accounts Torres established at Bank of America; and between about December

2012 and about June 2014, checks totaling about $1.7 million were deposited into three accounts he established at Wells Fargo; for a combined total of about $13.2 million.

19. The subcontractors knew or recklessly disregarded that the drywall construction crews were made up primarily of undocumented aliens because (1) there would have been no need to use the services of Jose Torres if the crews were operating lawfully; (2) the subcontractors accepted insurance certificates in the name of Jose R. Torres Drywall even though they knew Jose Torres wasn't in the drywall business; and (3) their interactions with the drywall crews confirmed they knew the crew members were not lawfully present in the United States.

20. For example, in November 2014, defendant Countess told a crew leader more than once that he knew the crew leader was a "wetback," making the comments in front of other employees of his company, Plaster Masters.

## COUNT 1

**8 U.S.C. § 1324(a)(1)(A)(iv) and (v)(I)**
**(Conspiracy to Encourage Aliens to Reside in the United States**
**for Commercial Advantage and Private Financial Gain**
**Knowing or in Reckless Disregard of their Unlawful Status)**

21.    Paragraphs 1-20 are incorporated by reference.

22.    Between about October 2011 and about October 2014, within the

District of Kansas and elsewhere, the defendants,

**KEITH L. COUNTESS,**
**PLASTER MASTERS, L.C.,**
**MARCOS LANE STUBBS,**
**LUIS FELIPE GUERRERO-GUERRERO,**
**JOSE FELIPE HERNANDEZ-CALVILLO,**
**MAURO PAPALOTZI, and**
**ISAAC GALLEGOS,**

and others both known and unknown to the grand jury, engaged in a conspiracy,

for the purpose of commercial advantage and private financial gain, to induce and

encourage aliens to reside in the United States, knowing and in reckless disregard

of the fact that such residence is in violation of law, in violation of Title 8, United

States Code, Sections 1324(a)(1)(A)(iv) and (v)(I).

## PURPOSE AND OBJECT OF THE CONSPIRACY

23.    The purpose and object of the conspiracy, and its manner and means,

included as follows:

a. The purpose of the conspiracy was to make money and create wealth for

the defendants.

b. The object of the conspiracy was to facilitate the use of undocumented

alien labor so that the costs of drywall construction projects could be minimized

to the financial benefit of the co-conspirators.

c. The conspiracy required that aliens not lawfully present in the United States be available to do the drywall work; this was accomplished by providing ongoing employment and unlawful cash payments to the them, thereby inducing and encouraging their ongoing residence in the United States.

d. But for the presence of the undocumented aliens working and being paid as described herein, the conspiracy could not be maintained because the commercial advantage gained by the co-conspirators would not be possible.

e. By entering into an agreement to pay undocumented workers through the venture carried out by Jose Torres-Garcia, defendants Countess and Plaster Masters paid less in labor costs than they would have incurred had they used legitimately operating subcontractors or directly employed drywall workers.

f. By going through Torres, defendants Countess and Plaster Masters avoided having to acquire and pay for unemployment insurance, workers compensation insurance, and liability insurance to cover the work crews paid through Torres.

g. By going through Torres, defendants Countess and Plaster Masters avoided the expense of directly employing workers to perform their drywall construction projects, such as payment of market wages, employee benefits such

as health insurance, payment of employee-related state and federal income tax and Social Security withholdings, and costs associated with complying with Employee Eligibility Verification Act and its I-9 form requirements.

h. By going through Torres, defendants Countess and Plaster Masters avoided the higher cost of hiring legitimately operating subcontractors, who must pay the various expenses associated with the direct employment of drywall workers that Countess and Plaster Masters were able to avoid.

i. By going through Torres, defendants Countess and Plaster Masters placed themselves at a competitive advantage in the obtaining of drywall construction projects.

j. By going through Torres, defendants Guerrero, Hernandez, and Papalotzi were able to gain employment for themselves and their crews without having to purchase and provide legitimate workers compensation and liability insurance certificates to Countess and Plaster Masters.

k. By going through Torres, defendants Luis, Hernandez, and Papalotzi were able to obtain jobs and money for themselves and their crews without having to pay market wages, incur employee-related expenses such as workers compensation insurance, liability insurance, unemployment insurance, health

insurance, state and federal income tax and Social Security withholdings, and other employee related expenses as I-9 form compliance and accounting and payroll services.

l. By going through Torres, the co-conspirators are able to maintain a stable of undocumented alien workers who, because they are unlawfully present in the United States, do not have permission or authority to be employed in the United States, and cannot easily open and maintain accounts at U.S. financial institutions, and therefore must be paid in cash to maintain their residence in the United States.

m. By assisting Torres in the venture, and by lending him start-up capital, and by providing a place for Torres to do business, and by referring drywall contractors to Torres, defendants Stubbs and Gallegos regularly received tax-free cash payments from Torres.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

24.   In furtherance of the conspiracy, and to effect the objects thereof, one or more of the co-conspirators committed and caused to be committed at least one of the following acts, among others, within the District of Kansas and elsewhere:

a. In about October 2011, Torres, at the direction of Gallegos and Stubbs, established bank accounts for the purpose of depositing checks into those accounts

from which he could later make cash withdraws for payment to drywall crews using primarily undocumented workers.

b. In about October 2012, Torres, also at the direction of Gallegos and Stubbs, obtained an Employer Identification Number from the Internal Revenue Service, which he needed to be able to secure workers compensation and liability insurance and for the purpose of receiving payments from Plaster Masters.

c. In about October 2012, and at other times during the course of the conspiracy, Torres purchased workers compensation insurance and liability insurance in the name of Jose R. Torres Drywall.

d. During the course of the conspiracy, Torres deposited about 250 checks totaling about $735,000 issued by Plaster Masters for drywall construction work done by drywall crews who were obtaining cash from Torres to pay the crews.

e. Torres instructed the drywall crews to direct Countess and Plaster Masters to make the drywall construction work checks payable to "Jose R. Torres Drywall" even though the crews were not employed by nor contracted through "Jose R. Torres Drywall" or Jose Torres.

f. Torres arranged for worker's compensation insurance and liability insurance certificates to be provided to Countess and Plaster Masters even though

the crews doing jobs for Countess and Plaster Masters were not employed by nor contracted through "Jose R. Torres Drywall" or Jose Torres.

g. Countess and Plaster Masters assigned work daily and regularly to the drywall crews led by Guerrero, Papalotzi, Hernandez and others at the Plaster Masters office in Lawrence, at which time Countess and Plaster Masters provided supplies needed for those jobs to the crews and arranged for the delivery of sheetrock and other construction materials to the job sites.

h. From time to time, Countess would go to the job sites while the crews were working to insure the jobs were being done properly and on schedule.

i. Countess and Plaster Masters issued checks weekly to the drywall crews completing Plaster Masters jobs. The checks were made payable to Jose R. Torres Drywall regardless of which drywall crew was performing the jobs.

j. Countess and Plaster Masters issued Department of the Treasury Forms 1099-MISC, to "Jose R. Torres Drywall" knowing Jose R. Torres Drywall and Jose Torres were not engaged in drywall construction; for example, Plaster Masters, L.C., issued a Form 1099-MISC for calendar year 2013 to Jose R. Torres Drywall in the amount of $426,292.31.

k. Torres deposited the weekly checks issued by Plaster Masters into the

accounts he established and withdrew cash to pay the drywall crews made up primarily of undocumented aliens and withholding five percent, as described in paragraphs 13-18 above.

l. Between about October 2011 and October 2012, Torres paid Gallegos two of the five percent he withheld from drywall constructions checks issued to compensate Gallegos for his contributions to the venture.

m. Between about October 2011 and about October 2014, Torres paid Stubbs one of the five percent to compensate Stubbs for his contributions to the venture.

### COUNTS 2-9

**8 U.S.C. § 1324(a)(1)(A)(iv) and (v)(II)**
**(Encouraging or Inducing Aliens to Reside in the United States**
**for Commercial Advantage and Private Financial Gain**
**Knowing or in Reckless Disregard of their Unlawful Status)**

25.     Paragraphs 1-24 are incorporated by reference.

26.     In about October 2014, within the District of Kansas and elsewhere, the defendants,

**KEITH L. COUNTESS,**
**PLASTER MASTERS, L.C.,**
**MARCOS LANE STUBBS,**
**LUIS FELIPE GUERRERO-GUERRERO,**
**JOSE FELIPE HERNANDEZ-CALVILLO,**
**MAURO PAPALOTZI, and**
**ISAAC GALLEGOS,**

13

intentionally induced and encouraged an alien, for the purpose of commercial advantage and private financial gain, to reside in the United States, knowing and in reckless disregard of the fact that such residence is in violation of law, as follows:

| COUNT 2 | Alien's initials: JR |
|---|---|
| COUNT 3 | Alien's initials: PR |
| COUNT 4 | Alien's initials: JH |
| COUNT 5 | Alien's initials: JR |
| COUNT 6 | Alien's initials: F.N.U. L.N.U.#1 |
| COUNT 7 | Alien's initials: F.N.U. L.N.U.#2 |
| COUNT 8 | Alien's initials: F.N.U. L.N.U.#3 |
| COUNT 9 | Alien's initials: MD |

All in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv) and (v)(II).

## **CRIMINAL FORFEITURE**

27.    The allegations in paragraphs 1-26 are realleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States

of America of certain property in which the defendants have an interest, pursuant to the provisions of Title 8, United States Code, § 1324(b), Title 18, United States Code, §§ 1956(a)(1)(B)(i) and 2, and Title 18, United States Code, §§ 1344(2) and 2, and the procedures outlined in Title 21, United States Code, § 853 and Title 28, United States Code, § 2461.

28.   Upon conviction of any violation of Title 8, United States Code, § 1324(a), each defendant shall forfeit to the United States the gross proceeds of such violation, and any property traceable to such proceeds, pursuant to Title 8, United States Code, § 1324(b) and pursuant to Title 18, United States Code, § 982(a)(6). Upon conviction for any violation of Title 18, United States Code, § 1546, each defendant shall forfeit to the United States the gross proceeds of such violation, and any property traceable to such proceeds, pursuant to Title 18, United States Code, § 982(a)(1). Upon conviction of any violation of Title 18, United States Code, § 1344(2), each defendant shall forfeit to the United States the proceeds of such violation, pursuant to Title 18, United States Code, § 982(a)(2).

29.   The property subject to the forfeiture includes, but is not limited to, the following:

a. REAL PROPERTY

b. PROCEEDS CONTAINED IN BANK ACCOUNTS

c. SUBSTITUTE ASSETS

If the property described above as being subject to forfeiture, as a result of any act or omission of any defendant,

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, § 853(p), as incorporated by Title 18, United States Code, § 982(b), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property or to seek return of the property to the jurisdiction of the Court so that the property may be seized and forfeited.

All pursuant to the provisions of Title 8, United States Code, § 1324(b), and

the procedures outlined in Title 21, United States Code, § 853(p).

**A TRUE BILL.**

11/08/16                                   /s/ Foreman
Date                                       Foreperson of the Grand Jury

**THOMAS E. BEALL**
Acting United States Attorney
District of Kansas

s/Brent I. Anderson
Brent I. Anderson
Assistant United States Attorney
301 North Main Street, Suite #1200
Wichita, KS 67202-4812
316-269-6481
316-269-6484 (fax)
brent.anderson@usdoj.gov

**s/Jabari Wamble**
JABARI B. WAMBLE, #22730
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
(913) 551-6730 (telephone)
(913) 551-6541 (fax)
Email: jabari.wamble@usdoj.gov

[It is requested that jury trial be held in Kansas City, Kansas.]

**PENALTIES**

**Count 1**, Conspiracy to Encourage or Induce Undocumented Aliens to Reside in the U.S. for Commercial Advantage or Private Financial Gain, 8 U.S.C. § 1324(a)(1)(A)(iv) and (v)(I);

- Not more than 5 years in prison
- Not more than a $250,000 fine
- Not more than 3 years of supervised release
- $100 special crime victims fund assessment

**Counts 2-9**, Encouraging or Inducing Undocumented Aliens to Reside in the U.S., 8 U.S.C. § 1324(a)(1)(A)(iv) and (v)(II):
- Not more than 5 years in prison
- Not more than a $250,000 fine
- Not more than 3 years of supervised release
- $100 special crime victims fund assessment